# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| SINCLAIR AND ASSOCIATES OF GREENVILLE, LLC, ) ) ) | |
| Plaintiff, ) ) | No. 2:16-cv-00465-DCN |
| vs. ) ) | **ORDER** |
| CRESCOM BANK, ANTLER ROAD, LLC, CRESCENT HOMES SC, LLC, PARK INVESTORS, LLC, JAMIN HUJIK, EDWARD M. TERRY, and ROBERT E. SAMPLE, ) ) ) ) ) ) | |
| Defendants. ) ) | |

This matter is before the court on defendants Antler Road, LLC, Crescent Homes SC, LLC, Park Investors, LLC, Jamin Hujik, and Edward M. Terry's ("SCUPTA defendants") motion to dismiss and defendant Edward M. Terry's ("Terry") separate motion to dismiss. For the reasons stated below, the court grants the SCUPTA defendants' motion and denies Terry's motion.

## I. BACKGROUND[1]

Plaintiff Sinclair and Associates of Greenville, LLC ("Sinclair") is a design firm engaged in the business of providing engineering, land surveying, and project management services, with particular expertise in the area of pool design and engineering. Compl. ¶¶ 5, 7. In or around 2004, Sinclair contracted with Summerville Homes, LLC ("Summerville Homes"), the then-owner of the Baker Plantation subdivision in North Charleston, South Carolina, to prepare civil engineering and

---

[1] The following facts are drawn from plaintiff's complaint and presented in the light most favorable to plaintiff.

1

architectural plans and technical drawings for a pool and amenities center at Baker Plantation (the "Works"). Id. ¶¶ 31, 32. Sinclair then prepared and sealed the Works, and licensed the Works to Summerville Homes. Id. ¶¶ 33, 40. This license granted a non-transferable, limited right to use the Works in connection with Summerville Homes's construction of the amenities center and pool at Baker Plantation. Id. ¶¶ 39–41. However, Sinclair never sold the Works or any interest therein to any party. Id. ¶ 39.

Summerville Homes never began construction on the pool and amenities, and instead, conveyed the Baker Plantation property to defendant CresCom Bank ("CresCom") via a deed in lieu of foreclosure. Id. ¶¶ 47, 48. Around the time of this transaction, CresCom somehow obtained a copy of the Works.[2] Id. ¶ 49. CresCom subsequently conveyed the Baker Plantation property and the Works to defendant Antler Road, LLC ("Antler Road"). Id. ¶¶ 57, 58, 61. In December 2011, defendant Jamin Hujik, the vice president of CresCom, and Terry, the manager of Antler Road and president of Crescent Homes SC, LLC ("Crescent Homes"), each asked Sinclair whether it would be willing to release its copyrights in the Works. Id. ¶¶ 12, 14, 64–67, 76–79. On both occasions, Sinclair stated that it would be willing to do so in exchange for payment, but none of the defendants ever accepted this offer. Id. ¶¶ 65, 77–79. In fact, Terry personally rejected the offer on December 29, 2011, stating that the Works were not worth the amount Sinclair requested. Id. ¶ 79.

Despite never having paid for the Works, Antler Road subsequently used the Works to construct the pool and amenities center at Baker Plantation. Id. ¶¶ 81, 82.

---

[2] The complaint does not explain how CresCom obtained the Works, but simply states that "[o]n information and belief, in relation to CresCom's acquiring the Baker Plantation property, CresCom obtained a copy of the Works from a party other than [Sinclair]." Compl. ¶ 49.

After purchasing the Baker Plantation property from Antler Road, Crescent Homes also used the Works in this manner. Id. ¶¶ 83, 84, 91. At some point, either Antler Road or Crescent Homes provided defendants Park Investors, LLC ("Park Investors") and Robert E. Sample ("Sample") with copies of certain portions of the Works, which Park Investors used to construct the amenities center and Sample used to create derivative plans for the pool. Id. ¶¶ 95–110. Sample's derivative plans were later used to obtain a construction permit for the pool from the Department of Health and Environmental Control. Id. ¶ 112. At all times relevant to this action, the various defendants were aware that either Antler Road or Crescent Homes planned to use the Works in this manner and that neither Antler Road nor Crescent Homes had the right to so use the Works. Id. ¶¶ 62, 68–76, 80, 85, 90, 91, 99–101, 106–109. Crescent Homes now markets the Baker Plantation subdivision using the pool and amenities center, id. ¶ 117, and all defendants have profited from their use or conveyance of the Works. Id. ¶ 118.

On February 17, 2016, Sinclair filed the instant action bringing claims for direct copyright infringement, contributory copyright infringement, and conversion against all defendants, and a claim for violation of the South Carolina Unfair Trade Practices Act, S.C. Code §§ 39-5-10, et seq. ("SCUPTA") against the SCUPTA defendants. On April 4, 2016, the SCUPTA defendants filed a motion to dismiss Sinclair's SCUPTA claim, and on April 5, 2016, Terry filed a motion to dismiss all claims against him. Sinclair filed responses to both motions on April 21, 2016. The motions are now ripe for the court's review.

## II. STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." When considering a Rule 12(b)(6) motion to dismiss, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. See E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). On a motion to dismiss, the court's task is limited to determining whether the complaint states a "plausible claim for relief." Id. at 679. Although Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). "Facts pled that are 'merely consistent with' liability are not sufficient." A Soc'y Without a Name v. Va., 655 F.3d 342, 346 (4th Cir. 2011) (quoting Iqbal, 556 U.S. at 678).

## III. DISCUSSION

### A.   SCUPTA Defendants Motion to Dismiss

The SCUPTA defendants argue that Sinclair's SCUPTA claim must be dismissed because the complaint fails to allege that the SCUPTA defendants' conduct has the potential for repetition, and thus, Sinclair has failed to allege conduct adversely affecting the public interest. SCUPTA Defs.' Mot. 3–6. In response, Sinclair argues that it has

4

alleged a potential for repetition, and even if it has not, the SCUPTA defendants' actions had a number of adverse impacts on the public interest beyond their potential repetition. Pl.'s SCUPTA Resp. 7–9.

The SCUPTA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry, 743 S.E.2d 808, 815 (S.C. 2013) (quoting S.C. Code § 39-5-20(a)) (emphasis omitted). The SCUPTA also provides for a private right of action, when a plaintiff shows that: "(1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected the public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)." Id. at 816 (quoting Wright v. Craft, 640 S.E.2d 486, 498 (S.C. Ct. App. 2006) (alterations omitted). It is well established that "[t]he act is not available to redress a private wrong where the public interest is unaffected," Bracken v. Simmons First Nat. Bank, No. 6:13-cv-1377, 2014 WL 2613175, at *6 (D.S.C. June 9, 2014) (quoting Bessinger v. Food Lion, Inc., 305 F. Supp. 2d 574, 582 (D.S.C. 2003), aff'd sub nom. 115 F. App'x 636 (4th Cir. 2004)) (internal quotation marks omitted). Consequently, the act does not reach "unfair or deceptive act[s] or practice[s] that affect[] only the parties to a trade or a commercial transaction." Id. (quoting Noack Enterprises, Inc. v. Country Corner Interiors of Hilton Head Island, Inc., 351 S.E.2d 347, 349–50 (S.C. Ct. App. 1986)).

A plaintiff may show that an unfair or deceptive act or practice adversely affects the public interest by demonstrating a potential for repetition. Bahringer v. ADT Sec. Servs., Inc., 942 F. Supp. 2d 585, 594 (D.S.C. 2013). Potential for repetition is generally

5

demonstrated in one of two ways: "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the [defendants]'s procedures create a potential for repetition of the unfair and deceptive acts." Id. (quoting Wright, 640 S.E.2d at 498). However, these are not the only methods of proving a potential for repetition, and a potential for repetition is not the only method of proving a threat to the public interest. See Daisy Outdoor Advert. Co. v. Abbott, 473 S.E.2d 47, 51 (S.C. 1996) (explaining that "[s]ometimes, the potential for repetition <u>or other adverse impact on the public interest</u> will be apparent," and "declin[ing] to hold . . . that [similar past occurrences and defendant's procedures] are the only means for showing potential for repetition/public impact") (emphasis added). Ultimately, the public interest prong of the SCUPTA analysis is flexible enough that "each case must be evaluated on its own merits." Id. Still, the requirement "must be proved by specific facts." Jefferies v. Phillips, 451 S.E.2d 21, 23 (S.C. Ct. App. 1994). "Without proof of specific facts disclosing that members of the public were adversely affected by the unfair conduct or that they were likely to be so affected, the result is a 'speculative claim of adverse public impact [] that will not suffice under the [SCUPTA].'" Bracken, 2014 WL 2613175, at *7 (quoting Jefferies, 451 S.E.2d at 23).

### 1.     Potential for Repetition

Sinclair first argues that the complaint alleges a potential for repetition by alleging that "the [SCUPTA defendants] engaged in the business of developing Baker Plantation and are engaged in the development or construction business in South Carolina." Pl.'s SCUPTA Resp. 7. This allegation is clearly insufficient. It does not provide any indication that the SCUPTA defendants took similar actions in the past or that any of "the

6

[SCUPTA defendants'] procedures create a potential for repetition." Bahringer, 942 F. Supp. 2d at 594 (emphasis added). To the extent Sinclair suggests that a defendant's continued engagement in commercial activity presents a potential for repetition, its argument is unduly speculative. "The mere proof that the actor is still alive and engaged in the same business is not sufficient to establish [an adverse impact on the public interest]." Jefferies, 451 S.E.2d at 24. Thus, Sinclair has failed to plead facts showing that the SCUPTA defendants' actions demonstrated a potential for repetition.

### 2.     Public Confusion

Sinclair next argues that, even if the SCUPTA defendants' actions did not possess a potential for repetition, they adversely affected the public interest in a number of other ways. For instance, Sinclair contends that "the facts alleged in the [c]omplaint show that members of the public are likely to be confused as to [SCUPTA defendants'] authority to use the Works." Pl's. SCUPTA Resp. 8.

Assuming the subject ever crosses the public's mind, the court could conceive that such confusion may persist. Indeed, many members of the public may be entirely mistaken in assuming the SCUPTA defendants possessed the right to use the Works. However, the court does not believe that this confusion constitutes "harm" to the public within the meaning of the SCUPTA. The case of Preferred Home Inspections, Inc. v. Bellsouth Telecommunications, LLC, No. 3:14-cv-00673, 2014 WL 4793824 (D.S.C. Sept. 25, 2014) is instructive on this point. In Preferred Home Inspections, the plaintiff switched service providers on his business telephone line from AT&T to Verizon Wireless and asked AT&T to transfer his telephone number to Verizon Wireless. Id. at *1. The plaintiff alleged that following this request, AT&T began forwarding his calls to

an AT&T automated message, then to a complete stranger, and eventually, to AT&T's directory assistance, which offered to connect the callers to plaintiff's competitors.  Id. The court found that these allegations showed the plaintiff's "customers and clients— members of the public—were adversely impacted, in the broadest sense," but explained that the only adverse impact shown by such facts was "frustration."  Id. at *11.  The court then held that "[f]rustration is not the type of harm contemplated by an act designed to stamp out 'immoral, unethical, or oppressive' commercial conduct," id. (quoting Health Promotion Specialists, LLC, 743 S.E.2d at 816) (emphasis added), "[n]or is frustration in keeping the type of harms usually associated with [SCUTPA] violations."  Id.

The same can be said of the public's "confusion" regarding the SCUPTA defendants' rights to use the Works.  While certain members of the public could possibly feel somehow aggrieved by this misrepresentation of intellectual property rights, plaintiff has not explained how this harms the public's economic or social interests.  The only "public" interest at stake in this case appears to be the public's general interest in information for information's sake.  Members of the public may have any number of interests in learning about the rights of others, but to elevate these curiosities to the status of "public interests" would render that phrase—and consequently, the SCUPTA's public interest requirement—meaningless.  If the public's interest in simply knowing the status of other's rights is enough to bring a violation of such rights within the scope of the SCUPTA, then any ordinary breach of contract would come within the scope of the SCUPTA because the aggrieved party could always contend that the public has an interest in resolving the confusion about whether his counter-party's actions constituted a breach under the contract.  This is clearly not the result contemplated by the act.

8

### 3.     Consumer Confusion

To the extent Sinclair's concern over public "confusion" is meant to implicate harm to its business reputation or brand, the argument is somewhat more substantial. Harm to a plaintiff's brand has been recognized under the SCUPTA in cases involving trademark violations where a defendant's actions create a "likelihood of consumer confusion."  See Johnson v. Sosebee, 397 F. Supp. 2d 706, 712 (D.S.C. 2005) (recognizing that "[t]he standard for liability for trademark infringement under the [SCUTPA], like that of the Lanham Act, is likelihood of consumer confusion"); Glob. Prot. Corp. v. Halbersberg, 503 S.E.2d 483, 487 (S.C. Ct. App. 1998) ("[B]ecause the copying produced a substantially identical product, a consumer had no way of knowing the truth about the source of the item in question. . . . We think this supports the master's finding that the public interest requirement was met.").  Of course, Sinclair alleges copyright violations, not trademark violations.  The court finds this distinction important because the concerns of trademark law do not appear to be present in this case. Trademark law is designed to "'protect the goodwill represented by particular marks,'" and "allow[] 'consumers readily to recognize products and their source.'"  George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392–93 (4th Cir. 2009) (quoting OBX–Stock, Inc. v. Bicast, Inc., 558 F.3d 334, 339 (4th Cir. 2009)).  Thus, "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally."  Radiance Found., Inc. v. N.A.A.C.P., 786 F.3d 316, 324 (4th Cir. 2015) (quoting Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991)).  The Works at issue in this case were not created to identify the origin of a particular product; they were the product.  Nor is there any indication in the complaint that the SCUPTA

defendants' use of the Works is likely to confuse Sinclair's potential clients.[3] The complaint simply does not contain sufficient facts to make out a plausible allegation of adverse public interest through consumer confusion.

### 4. Copyright Confusion

Sinclair next offers a related argument that "[the SCUPTA defendants'] conduct [] affects or could affect other persons and entities that hold copyrights by blurring the certainty of ownership that is preserved when copyrights are acknowledged and upheld." Pl.'s SCUPTA Resp. 8. Certainly, the rights guaranteed by copyright law serve a public purpose by "creat[ing] incentives for creative effort." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450 (1984). Thus, one might argue that copyright infringement harms this public purpose by reducing the incentive to create copyrighted material. The problem is this basic argument could be applied to any set of legal rights, including ordinary contract or real property rights. In the same way that copyright infringement might discourage the production of creative works, breach of contract might discourage economic activity premised on contract rights, and trespass might discourage economic activity premised on real property rights. Sinclair's argument would undo the well-established rule that the SCUPTA does not extend to disputes that only affect the parties to a particular commercial transaction. Bracken, 2014 WL 2613175, at *6. The fact that rights serve a public function does not mean than any intrusion of such rights adversely affects the public interest under the SCUPTA.

---

[3] Alternatively, one might argue that the SCUPTA defendants created confusion among the purchasers of homes in Baker Plantation. However, the complaint gives no indication that such confusion even exists, and certainly fails to specifically explain how these consumers are harmed by such confusion. For instance, there is no indication that homeowners in Baker Plantation based their purchasing decision on the belief that the SCUPTA defendants had the right to use the Works.

Again, the court finds the contrast between trademark and copyright law instructive on this matter. As discussed above, a violation of trademark law can be recognized as an unfair or deceptive act or practice under the SCUPTA where it creates a "likelihood of consumer confusion." See Johnson, 397 F. Supp. 2d at 712 (recognizing that "[t]he standard for liability for trademark infringement under the [SCUTPA], like that of the Lanham Act, is likelihood of consumer confusion"). This makes sense because trademark law protects the mark holder's ability to connect with the consuming public. See George & Co. LLC, 575 F.3d at 392–93. Thus, the public derives its own direct benefit from trademark protections. The same is not true for copyrights. Copyrights serve the public indirectly, by granting a right of monopoly over the copyrighted work in the hopes that this prize will incentivize producers to generate more creative material. The focus in copyright law is on protecting "the copyright holder's ability to obtain the rewards that Congress intended him to have," in order to keep this incentive structure intact. Sony Corp. of Am., 464 U.S. at 450.

This distinction between direct and indirect public benefits explains why the public's interest in copyrights is more comparable to its interest in contract rights or real property rights than its interest in trademark rights, and consequently, why allegations of copyright infringement do not necessarily support a SCUPTA claim. Under the SCUPTA, the adverse public interest must be the direct result of the defendant's actions. It is not enough that the defendant simply offend or undermine any framework of rights that somehow benefits the public. Otherwise, there would be no way of excluding actions that affect only the parties to the action because almost any framework of rights involved in commercial activity can be said to indirectly affect the public interest by

ensuring "certainty of ownership." Pl.'s SCUPTA Resp. 8. Thus, any plaintiff could say that an otherwise private dispute affected the public interest because the defendant's actions "blurr[ed] the certainty of ownership that is preserved" when the particular rights at issue "are acknowledged and upheld." Id.

Prior case law supports this conclusion. In Ethox Chem., LLC v. Coca-Cola Co., Coca-Cola asked plaintiff Ethox Chemical, LLC ("Ethox") to help develop a molecule for use in Coca-Cola's plastic bottles. No. 6:12-cv-01682, 2013 WL 41001, at *1 (D.S.C. Jan. 3, 2013). After one of Ethox's chemists, plaintiff James Tanner ("Tanner"), developed the molecule, Coca-Cola allegedly filed two patent applications which included the molecule, without informing Ethox or listing Tanner as a co-inventor. Id. The court found that such allegations did not state a viable SCUPTA claim because the plaintiffs failed to allege that Coca-Cola's actions had a potential for repetition. Id. at *3. Notably, the court expressed no concern over the effect Coca-Cola's actions may have on the public's interest in patent law, which—like copyright law—operates by guaranteeing private rewards for creators of materials deemed publically valuable. See United States v. Univis Lens Co., 316 U.S. 241, 250 (1942) ("The declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly."). To the contrary, the court found that "the outcome of [the] case will affect only the parties and not the broader public." Ethox Chem., 2013 WL 41001, at *3.

Similarly, in Ameristone Tile, LLC v. Ceramic Consulting Corp., the court dismissed a tile manufacturer's SCUPTA claim against its sales agents for effectively giving a competitor the manufacturer's tile designs, holding that such allegations did not "establish an adverse effect on the public interest." 966 F. Supp. 2d 604, 621–22 (D.S.C.

12

2013).  Though the Ameristone Tile case did not deal with any specific intellectual property interests, the argument Sinclair presses here—that creators will be discouraged by the unlawful use of their creations—would still have been relevant.  As in Ethox, however, the Ameristone Tile court expressed no such concern.  This lack of concern for creator's proprietary interests in their creations comports with this distinction between direct and indirect public benefits outlined above, and strongly suggests that such interests are not recognized as "public interests" under the SCUPTA.

  Nevertheless, there are at least two cases that have recognized SCUPTA claims involving copyrighted or patented material.  In Raco Car Wash Sys., Inc. v. Smith, a plaintiff brought a SCUPTA claim based on the defendants' use of its copyrighted computer program.  730 F. Supp. 695, 705 (D.S.C. 1989).  After a bench trial, the court found that the defendants "misappropriation of the [] program [was] an unfair act that adversely affects the public interest."  Id. at 706.  In response to the defendants' post-trial motion to amend the judgment, the court explained that it did not base this finding on the "potential for repetition."  Id. at 708.  However, the court did not provide any further indication of its reasoning on the issue.  Id.  More recently, in Milliken & Co. v. Weiner, the court denied a motion to dismiss a carpet company's SCUPTA claim based on the defendants "false advertising . . . regarding certain exclusive and patented technologies and alleged fraudulent misrepresentations to the patent office about the same."  No. 7:14-cv-4422, 2015 WL 5474647, at *2 (D.S.C. Sept. 17, 2015).  The court held that it was simply impossible to find, at the motion to dismiss stage, "that the allegations of deception to the public at large and a government agency are not of a severity, specificity, and breadth to constitute public impact for purposes of the SCUPTA."  Id. at *2.

Certainly, Raco Car Wash and Milliken weigh against dismissal of Sinclair's SCUPTA claim, but on further inspection, the court is not convinced that they carry enough weight to disturb that result. Neither decision precisely defined the public harm it relied on in reaching its decision, making it difficult to assess whether Sinclair alleged a comparable harm in this case. Indeed, there is some indication that the Milliken court did not adopt Sinclair's interpretation of public harm. The Milliken court's reference to "false advertising" could be construed as a reference to the consumer confusion concerns that are not present here as explained in part III.A.3, and its discussion of "misrepresentations to the patent office" simply has no analog in Sinclair's complaint.[4] Even if the court assumes that the Raco Car Wash and Milliken holdings were based on the defendants' misappropriation of copyrighted material, the court is still faced with the question of whether this analysis is actually compatible with the SCUPTA. The Ethox and Ameristone Tile decisions provide some indication that it is not. More importantly, it appears incompatible with the well-established principle that the act does not reach "unfair or deceptive act[s] or practice[s] that affect[] only the parties to a trade or a commercial transaction." Bracken, 2014 WL 2613175, at *6 (quoting Noack Enterprises, 351 S.E.2d at 349–50). Any public interest in the "certainty of ownership that is preserved when copyright rights are acknowledged and upheld" is wholly indirect, and indistinguishable in principle from the public's interest in many other private rights that do not give rise to a SCUPTA claim. If the court were to allow Sinclair's SCUPTA claim to survive on this "certainty of ownership" theory, it would have no principled way of

---

[4] To the extent Sinclair argues that the SCUPTA defendants' use of the Works in connection with their application for certain building permits adversely affected the public interest, the court addresses this argument in part III.A.5, below.

preventing parties from making a SCUPTA claim out of any number of otherwise private commercial disputes.

### 5. Construction Permits

Finally, Sinclair contends that "[the SCUPTA defendants] impacted government entities by constructing the amenities center based on a permit that the City of North Charleston had issued [Summerville Homes], and . . . obtaining a pool permit from DHEC based on derivative plans unlawfully created using the Works." Pl.'s SCUPTA Resp. 8. Again, it is difficult to see how the public was harmed by such actions. The public's interest in construction permits seemingly has little to do with the identity of the proposed structure's designer, and plaintiffs have failed to explain any possible connection. As such, the court finds that this argument also fails to establish an adverse impact on the public interest.

Because the court finds that each of Sinclair's arguments fails to show how the SCUPTA defendants' conduct adversely affected the public interest, the court grants the SCUPTA defendants' motion to dismiss.

### B. Terry Motion to Dismiss

Terry moves to dismiss all claims against him on the grounds that the complaint fails to allege that his actions were outside the scope of his agency, and therefore, his acts must be attributed to Antler Road or Crescent Homes under the principle of respondeat superior. Terry Mot. 3–5. Sinclair contends that Terry cannot escape liability because he was personally involved in the alleged copyright infringement and conversion.[5] Pl.'s

---

[5] Because the court finds that Sinclair's SCUPTA claim must be dismissed, it is not necessary to analyze whether Terry could be held personally liable on that claim.

Resp. to Terry 4–9. The court addresses Terry's individual liability with respect to each of Sinclair's claims in turn.

### 1. Direct Copyright Infringement

An individual may be vicariously liable for direct copyright infringement where that individual "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." Jobete Music Co. v. Media Broad. Corp., 713 F. Supp. 174, 177–78 (M.D.N.C. 1988) (quoting Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971)); see also BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc., 2015 WL 7756130, at *30 (E.D. Va. Dec. 1, 2015) ("A variant on respondeat superior, vicarious liability holds a defendant accountable for third-party infringement if he '(1) possessed the right and ability to supervise the infringing activity; and (2) possessed an obvious and direct financial interest in the exploited copyrighted materials.'" (quoting Nelson–Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 513 (4th Cir. 2002))). "Unlike contributory infringement, vicarious liability is not based on the knowledge or intent of the defendant. It is entirely dependent on the existence of a financial benefit and the defendant's relationship to the infringement." BMG Rights Mgmt., 2015 WL 7756130, at *30.

Here, the complaint alleges that Terry is the manager of Antler Road and president of Crescent Homes. Compl. ¶¶ 15, 16. This suggests that Terry had some authority over each organization's operations. The complaint further alleges that Terry knew that Antler Road and Crescent Homes lacked the authority to use the Works and that Terry personally rejected Sinclair's offer to sell its copyrights therein. Id. ¶¶ 74–80, 90. Finally, the complaint states that Terry knew Antler Road and Crescent Homes

intended to use the Works to construct the pool and amenities center at Baker Plantation. Id. ¶¶ 80, 91.

The court finds these allegations more than sufficient to establish Terry's vicarious liability for direct copyright infringement. It is at least plausible to think that Terry could have exercised his authority as manager and president to prevent Antler Road and Crescent Homes from infringing on Sinclair's rights in the Works. See BMG Rights Mgmt., 2015 WL 7756130, at *30 ("The first element [of the vicarious liability inquiry] requires that the defendant 'declin[ed] a right to stop or limit' the direct infringement." (quoting Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005))). Terry's managerial positions also gave him a financial interest in Antler Road and Crescent Homes's use of the Works. See Jobete Music Co., 713 F. Supp. at 178 ("[A]s president, general manager, and owner of the station, her financial interest in the station's operations is obvious."); Broad. Music, Inc. v. Airhead Corp., 1990 WL 1239531, at *4 (E.D. Va. Dec. 27, 1990) (finding that officer of a defendant-corporation "has a direct and significant financial stake in the success of [the defendant-corporation]"). These allegations are sufficient to state a claim for vicarious liability.[6]

### 2.     Contributory Copyright Infringement

Sinclair also brings a claim for contributory copyright infringement. "One infringes contributorily by intentionally inducing or encouraging direct infringement." Grokster, 545 U.S. at 930. The Supreme Court has recognized that "the lines between direct infringement, contributory infringement and vicarious liability are not clearly

---

[6] Because the court finds that Sinclair has sufficiently stated a claim against Terry for vicarious liability, it is unnecessary to examine whether Sinclair has sufficiently pleaded that Terry was personally liable because he personally committed the infringing acts.

drawn."[7] Id. at 931 n.9 (quoting Sony Corp. of Am., 464 U.S. at 435 n.17). The complaint certainly alleges facts that would show Terry possessed the requisite mental state to induce or encourage direct infringement, as he was clearly aware that Antler Road and Crescent Homes had no right to use the Works, having personally rejected Sinclair's offer to sell such rights. Compl. ¶¶ 76–79. Terry's involvement in the use of Works beyond this point is not explicitly alleged. However, it is reasonable to infer that Terry "[i]nduce[d], cause[d] or materially contribute[d] to [Antler Road and Crescent Homes's] infringing conduct," based on Sinclair's allegation that he personally rejected their offer to sell the Works. Compl. ¶ 79. Therefore, the court finds that the complaint states a viable claim against Terry for contributory copyright infringement.

### 3.     Conversion

As for Sinclair's state-law conversion claim, "South Carolina courts have consistently held[] [that] "[a]n agent's liability for his own tortious acts is unaffected by the fact that he acted in his representative capacity." Perjen, Inc. v. Onyx Co., LLC, 2011 WL 11730338, at *1 (S.C. Ct. App. Jan. 25, 2011) (quoting Gilbert v. Mid-S. Mach. Co., 227 S.E.2d 189, 193 (S.C. 1976)). Thus, an "officer, director, or controlling person" will ordinarily be liable for the torts of the organization where such person "in some way participated in or directed the tortious act." Rowe v. Hyatt, 468 S.E.2d 649, 650 (S.C. 1996).

In South Carolina, conversion consists of "the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another to

---

[7] Some courts appear to regard contributory and vicarious liability as one theory. See Broad. Music, Inc. v. Jeep Sales & Serv. Co., 747 F. Supp. 1190, 1194 n.1 (E.D. Va. 1990) (setting forth test for vicarious liability under contributory liability label).

the exclusion of the owner's rights." Moore v. Weinberg, 681 S.E.2d 875, 878 (S.C. 2009). To the extent Antler Road and Crescent Homes's unauthorized use of the Works constitutes conversion—an issue which no defendant has disputed to this point—the court finds that the complaint sufficiently alleges Terry's participation in such actions, based on his personal involvement in the decision not to purchase Sinclair's copyrights. See Compl. ¶ 79. Therefore, the court finds that the complaint states a viable claim against Terry for conversion.

Because the complaint alleges facts sufficient to establish Terry's personal liability for each of Sinclair's remaining claims, the court denies Terry's motion to dismiss.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** the SCUPTA defendants' motion to dismiss without prejudice and **DENIES** Terry's motion to dismiss.

**AND IT IS SO ORDERED**.

        **DAVID C. NORTON**
        **UNITED STATES DISTRICT JUDGE**

**November 17, 2016**
**Charleston, South Carolina**